

**FILED**

Feb 04 2015, 9:54 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Randall J. Nye
O'Neill McFadden & Willett LLP
Schererville, Indiana

ATTORNEYS FOR APPELLEE

Michael D. Sears
Jacquelyn S. Pillar King
Crist, Sears & Zic, LLP
Munster, Indiana

Heather Fesko Delgado
Barnes & Thornburg LLP
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

Community Anesthesia & Pain
Treatment, L.L.C.,

*Appellant,*

v.

St. Mary Medical Center, Inc.,

*Appellee.*

February 4, 2015

Court of Appeals Case No.
45A03-1401-PL-44

Appeal from the Lake Superior Court

The Honorable Diane Kavadias
Schneider, Judge

Cause No. 45D11-1001-PL-4

**Brown, Judge.**

[1] Community Anesthesia & Pain Treatment, LLC, ("CAPT") appeals the trial court's order entering summary judgment in favor of St. Mary Medical Center, Inc., ("SMMC") with respect to Count I of SMMC's complaint and Counts II and III of CAPT's counterclaim. CAPT raises three issues which we consolidate and restate as whether the trial court erred in entering summary judgment in favor of SMMC. We affirm.

### Facts and Procedural History

[2] Prior to August 2006, a group headed by Dr. G[1] provided anesthesia services at SMMC. Dr. G was losing staff due in part to personal conflicts. On August 15, 2006, SMMC and CAPT entered into a contract to arrange for hospital-based services (the "Agreement") in which CAPT would provide anesthesiology services for patients at SMMC beginning on October 2, 2006, for a period of three years. At the request of SMMC, Dr. G became the medical director of the CAPT group. SMMC informed CAPT that a critical part of the Agreement was that CAPT keep Dr. G.

[3] Section 6.3 of the Agreement addressed compensation and provided in part that SMMC would pay CAPT a monthly income guarantee of $175,000 on the first day of each month and that, on or before the fifteenth day of each month,

---

[1] Both parties refer to this individual as Dr. G although he is identified in the record as Dr. Jorge Gonzalez. (Appellant's Brief at 4; Appellee's Brief at 5; Appellant's Appendix at 241)

CAPT would remit to SMMC all of its net anesthesiology collections received in the immediately prior month up to $175,000. Section 6.3(b)(3) provided:

> The annual income guarantee for such initial term shall be $2,100,000, payable by [SMMC] to [CAPT] as provided in this Section 6.3(b). Within forty-five (45) days following the end of each contract quarter during each of the three (3) years of the initial term of this Agreement, the parties shall complete an accounting reconciliation of [CAPT's] Net Anesthesiology Collections and compare such Net Anesthesiology Collections for the most recently ended contract quarter to the quarterly guaranteed net collections amount of $525,000 (the "Quarterly Income Guarantee Amount"). If [CAPT's] Net Anesthesiology Collections exceed the Quarterly Income Guarantee Amount, and if [SMMC] has accrued any shortfall amounts (as described in subsections (2), above), then [CAPT] shall pay [SMMC] within fifteen (15) calendar days of the completion of such reconciliation the aggregate of all such shortfall amounts, up to the amount by which [CAPT's] actual Net Anesthesiology Collections exceeds the Quarterly Income Guarantee Amount for such contract quarter. The accounting reconciliation for the fourth (4th) quarter of each of the three (3) years of the initial term of this Agreement shall serve as the annual reconciliation, such that at the conclusion of each year of the initial term, a full and complete reconciliation for such year shall be achieved as provided in this subsection. Final reconciliation shall occur at the end of the three (3) year term.

Appellant's Appendix at 155.

[4] Section 9.15 of the Agreement contained a non-solicitation clause which provided in part that SMMC agreed to not directly or indirectly solicit any physician who was employed by or under contract with CAPT at any time during the eighteen months prior to the date of termination of the Agreement.

Section 3.12 of the Agreement is titled "Locum Tenens Physicians"[2] and provided:

> For the first three (3) months of this Agreement, or at any time upon [SMMC's] request to remove a Physician per Section 8.4 if a mutually agreeable and reasonable amount of time is not provided to replace such Physician, it may be necessary for [CAPT] to retain one or more locum tenens physicians specializing in the practice of Anestbesiology [sic] (the "Locum Tenens Physician") to provide Anesthesiology Services. In such a case, [SMMC] shall reimburse [CAPT] for fifty percent (50%) of all direct and indirect costs of each and every Locum Tenens Physician incurred by [CAPT], upon receipt of a written invoice for those costs.

*Id.* at 149.

[5]     During the first year of the Agreement between November 16, 2006, and September 7, 2007, SMMC paid $1,575,000 to CAPT consisting of nine payments of $175,000. CAPT remitted payments to SMMC of $820,763.75. During the second year, from October 1, 2007, to September 2, 2008, SMMC paid $2,139,504 to CAPT consisting of eleven payments of $175,000 and a payment of $214,504, and CAPT paid SMMC $2,505,124. In October 2008, SMMC paid $175,000 to CAPT, and CAPT did not remit any net collections to SMMC.

---

[2] "Locum tenens" is defined generally as "[a] deputy; a substitute; a representative." BLACK'S LAW DICTIONARY 959 (8th ed. 2007).

On March 14, 2007, Milton Triana, the CEO / Administrator of SMMC, held a meeting with Dr. G and told him that he needed to change the manner in which he dealt with staff, and Dr. G admitted he needed to change his demeanor and to be nicer to staff. In a letter dated May 18, 2007, Triana informed Dr. Steven Gottlieb of CAPT that he was providing notice in accordance with Section 8.4 of the Agreement that SMMC was requesting the removal of Dr. G from services with SMMC due to the fact that SMMC perceived him to be a "problematic physician." *Id.* at 240. The letter also stated: "We understand that a reasonable period of time may be necessary for an appropriate transition of services as mutually agreed by the parties." *Id.* In a letter dated July 19, 2007, Triana wrote Dr. Tushar, the chief operating officer of CAPT, and informed him that Dr. G had completed an anger management course and that Triana reconsidered his initial request and would allow Dr. G to remain working at SMMC.

In an email dated March 25, 2008, Dr. Ramani informed Janice Ryba, an administrator for SMMC, that Dr. G resigned his position as an anesthesiologist at SMMC and that Dr. G informed CAPT that his last date of service would be June 13, 2008. The message also stated: "We have already been in contact with several well-qualified anesthesiologists regarding his open position and are confident that SMMC surgeons will continue to have excellent anesthesia service." *Id.* at 168. In a letter dated April 18, 2008, Ryba informed

Dr. Gottlieb of CAPT that SMMC requested the removal of Dr. G. At some point, Dr. G no longer worked for CAPT.[3]

[8] On November 21, 2008, CAPT and SMMC entered into a termination agreement (the "Termination Agreement") in which the parties agreed to terminate the Agreement with an effective date of December 1, 2008. The Termination Agreement provided that CAPT agreed to "release Kandiyur Seshadri, M.D. ('Dr. Seshadri') from any and all applicable restrictive covenants that exist between CAPT and Dr. Seshadri, as well as any provisions of the Agreement which otherwise would prohibit [SMMC] from directly or indirectly employing or retaining Dr. Seshadri to provide anesthesia services at [SMMC] . . . ." *Id.* at 96-97. The release was conditioned upon SMMC paying CAPT $100,000 and compliance by SMMC with obligations under the Termination Agreement and certain provisions of the Agreement including Section 3.12 dealing with *locum tenens*, Section 6.3 dealing with compensation, and Section 9.15 dealing with non-solicitation. In an email dated December 11, 2008, Dr. Ramani sent Ryba data for *locum tenens* reimbursement which indicated that SMMC owed CAPT $219,378.47.

[9] On May 20, 2009, SMMC filed a complaint against CAPT alleging: Count I, breach of contract; Count II, conversion; Count III, interference with prospective business advantage; Count IV, constructive fraud; Count V, unjust

---

[3] In its statement of facts, CAPT asserts that Dr. G's last day of service was to be June 13, 2008, but does not assert the date of his actual last day.

enrichment; Count VI, imposition of constructive trust; and Count VII, action for an accounting. On July 24, 2009, CAPT filed its answer and counterclaim. In its counterclaim, CAPT alleged: Count I, breach of contract based upon SMMC's failure to pay amounts due upon reconciliation of Agreement; Count II, breach of contract based upon SMMC's failure to reimburse *locum tenens* costs; and Count III, breach of contract based upon SMMC's violation of the non-solicitation provision of the Agreement.

[10] On March 30, 2012, both parties filed motions for summary judgment. CAPT's motion alleged that "summary judgment will reserve for trial only the claims between the parties for failure to pay amounts due upon reconciliation of the [Agreement] presented by Count I of the Complaint and Count I of the Counterclaim." *Id.* at 124. On September 6, 2012, the court held a hearing on the motions.

[11] On June 28, 2013, the court entered an order which provided in part:

## CONCLUSIONS OF LAW

\* \* \* \* \*

2. The parties' Motions for Summary Judgment, and, specifically, their respective breach of contract claims, center around three issues: (1) the meaning of the term "final reconciliation"; (2) reimbursement of *locum tenens* costs to CAPT; and (3) the non-solicitation provision contained in the Agreement.

3. Indiana law provides that a contract shall be interpreted as a whole in a way that harmonizes all of its provisions and does not render any words, phrases or terms meaningless. *T-3 Martinsville, LLC v. U.S. Holding, LLC*, 911 N.E.2d 100, 111 (Ind. Ct. App. 2009) (internal citations omitted)[, *clarified on reh'g, trans denied*].

4. Applying this standard to Section 6.3 of the Agreement, the Court hereby finds that this provision provided for four types of reconciliation-monthly, quarterly, annual and final. To accept CAPT's position that the "final reconciliation" is the last annual reconciliation would render "final" redundant in light of the annual reconciliations and would also render some provisions of the Section meaningless. CAPT's interpretation is inconsistent with the Agreement, which provided that "a full and complete reconciliation" shall be achieved for each year at the annual reconciliation. If, as CAPT contends, there is no carry over in reconciliations from year to year, there would also be no reason to provide for a final reconciliation, as the annual reconciliation provision cited herein ensures that each year is reconciled.

5. Additionally, while the Court finds that the Agreement is not ambiguous, even assuming *arguendo* that it was, any such ambiguity would be construed against CAPT, as the drafter of the Agreement. *Citizens Financial Services, FSB v. Innsbrook Country Club, Inc.*, 833 N.E.2d 1045, 1058 (Ind. Ct. App. 2005) (internal citations omitted)[, *reh'g denied*].

6. Therefore, the Court finds that summary judgment should be **GRANTED** as to [SMMC] and **DENIED** as to CAPT regarding Section 6.3 and the reconciliation provisions contained therein.

7. As for reimbursement of *locum tenens* costs, there is no dispute that [SMMC] requested the removal of a problematic physician, as allowed by the Agreement. However, at the time of removal, the undisputed evidence demonstrates that the physician's resignation had already been submitted and that CAPT was not providing an adequate number of physicians, e.g., four. Section 3.12 provided that if a mutually agreeable and reasonable period of time is not provided for replacement of the "problematic physician," CAPT *may* have to retain locum tenens physicians. There is no evidence before the Court that the reason CAPT incurred *locum tenens* costs from April to November of 2008 was the result of the removal request made by [SMMC].

8. Therefore, the Court finds that summary judgment should be **GRANTED** as to [SMMC] and **DENIED** as to CAPT regarding Section 3.12 and the reimbursement of *locum tenens* costs.

9. [SMMC] is only liable under the non-solicitation provision if it had violated Sections 6.3 or 3.12 of the Agreement, and this Court finds, as a matter of law, it has not, as evidenced by the preceding paragraphs.

10. However, even if there was a genuine issue of material fact as to whether [SMMC] breached Section 3.12 and/or Section 6.3 of the Agreement, the non-solicitation provision is unenforceable under Indiana law, as CAPT does not have a protectable business interest in that it has no operations in Indiana and cannot claim an interest in the patients of [SMMC]. *Duneland Emergency Physician's Medical Group, P.C. v. Brunk*, 723 N.E.2d 963, 966 (Ind. Ct. App. 2000)[, *trans. denied*].

11. Therefore, the Court finds that summary judgment should be **GRANTED** as to [SMMC] and **DENIED** as to CAPT regarding breach of the non-solicitation provision.

12. While the testimony of the CFO of [SMMC] supported [SMMC's] claims for damages, in light of the various amounts contained in the documents submitted by the parties, the Court will withhold entering a judgment of damages and will schedule a damages hearing to be conducted at a later date relative to the claims of [SMMC].

13. The Court finds that no genuine issue of material fact forecloses summary judgment in favor of CAPT as to Counts II through VII of [SMMC's] Complaint, and CAPT has demonstrated its entitlement to judgment as a matter of law relative to these Counts. Therefore, summary judgment is **GRANTED** to CAPT as to Counts II through VII of [SMMC's] Complaint.

### Judgment

**IT IS THEREFORE ORDERED** that pursuant to Rule 56 of the Indiana Rules of Trial Procedure, the Motion for Summary Judgment filed by Plaintiff/Counter-Defendant [SMMC] is **GRANTED** as to Count I of its Complaint and all claims and allegations contained in Defendant/Counter-Plaintiff's Counterclaim, and that the Motion for Summary Judgment filed by Defendant/Counter-Plaintiff [CAPT] is **GRANTED** as to Counts II through VII, inclusive, of the Complaint and

> **DENIED** as to Count I of the Complaint and all claims and
> allegations contained in the Counterclaim.

*Id.* at 16-20. The court scheduled a hearing to determine SMMC's damages for August 19, 2013.

On August 2, 2013, CAPT filed a motion for certification of interlocutory appeal and an objection to determination of damages by the court. On August 19, 2013, the court held a hearing on CAPT's motions, denied CAPT's motion for interlocutory appeal, and determined that trial by jury was appropriate for the determination of the amount of damages. On January 15, 2014, the parties filed an agreed judgment which ordered CAPT to pay $563,616.25 to SMMC and provided that the agreed judgment not affect CAPT's right to appeal the court's June 28, 2013 order or the agreed judgment.[4] The court approved the agreed judgment.

## *Discussion*

The issue is whether the trial court erred in entering summary judgment in favor of SMMC with respect to Count I of its complaint and Counts II and III

---

[4] The $563,616.25 amount is the difference between the total payments SMMC paid to CAPT, which was $3,889,504, and the total amounts CAPT paid SMMC, which was $3,325,887.75. On appeal, CAPT alleges in its statement of facts that it "submitted a 'payments reconciliation' which indicates that during the entire contract period a total of $2,314,504.00 was paid by the Hospital to CAPT, while CAPT paid $2,505,124.00 to the Hospital." Appellant's Brief at 8. CAPT also notes that "[a]s an accommodation to the Hospital, CAPT informally agreed, in January 2009, to go above and beyond the terms of its agreement by paying the Hospital all receipts for a limited period of time to assist the Hospital in making up its substantial revenues shortfall for the year 2007." *Id.* at 8 n.3. On appeal, CAPT does not argue that the amount of $563,616.25 specified in the Termination Agreement is incorrect. Rather, it argues that the trial court misinterpreted the Agreement.

of CAPT's counterclaim. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Mangold*, 756 N.E.2d at 973.

The Indiana Supreme Court recently held that summary judgment is a "high bar" for the moving party to clear in Indiana and held:

> Summary judgment is a desirable tool to allow the trial court to dispose of cases where only legal issues exist. But it is also a "blunt . . . instrument," by which "the non-prevailing party is prevented from having his day in court." We have therefore cautioned that summary judgment is not a summary trial, and the Court of Appeals has often rightly observed that it is not appropriate merely because the non-movant appears unlikely to prevail at trial. In essence, Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims.

*Hughley v. State*, 15 N.E.3d 1000, 1003-1004 (Ind. 2014) (quotations and citations omitted).

Our review of a summary judgment motion is limited to those materials designated to the trial court. *Mangold*, 756 N.E.2d at 973. In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. *Catt v. Bd. of Commr's of Knox Cnty.*, 779 N.E.2d 1, 3 (Ind. 2002). The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be

resolved. *Rice v. Strunk*, 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.* The fact that the parties make cross-motions for summary judgment does not alter our standard of review. *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind. Ct. App. 1997), *trans. denied.* Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

[16] To the extent that this case requires that we interpret the Agreement or the Termination Agreement, "[i]nterpretation of a contract is a pure question of law and is reviewed de novo." *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 252 (Ind. 2005). If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Id.* Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. *Id.* "We will make all attempts to construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Rogers v. Lockard*, 767 N.E.2d 982, 992 (Ind. Ct. App. 2002). "A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms." *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002), *reh'g denied.* "Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations." *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010). "When a contract's terms are ambiguous or

uncertain and its interpretation requires extrinsic evidence, its construction is a matter for the factfinder." *Id.* "An ambiguous contract will be construed against the party who drafted it." *Boswell Grain & Elevator, Inc. v. Kentland Elevator & Supply, Inc.*, 593 N.E.2d 1224, 1227 (Ind. Ct. App. 1992). Whenever summary judgment is granted based upon the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or the contract ambiguity, if one exists, can be resolved without the aid of a factual determination. *Mid State Bank v. 84 Lumber Co.*, 629 N.E.2d 909, 914 (Ind. Ct. App. 1994).

[17] CAPT argues that the trial court erred by (A) granting summary judgment to SMMC on Count I of SMMC's complaint by improperly interpreting Section 6.3 of the Agreement addressing reconciliation; (B) denying CAPT's motion for summary judgment with respect to Count II of its counterclaim dealing with SMMC's failure to reimburse *locum tenens* costs; and (C) denying CAPT's motion for summary judgment with respect to Count III of its counterclaim which alleged that SMMC breached the non-solicitation provision of the Agreement.

A. *Reconciliation*

[18] CAPT argues that the trial court misinterpreted Section 6.3 by concluding that shortfalls carry over from year to year. CAPT points to the following portion of Section 6.3(b)(3):

> The accounting reconciliation for the fourth (4th) quarter of each of the three (3) years of the initial term of this Agreement shall serve as the annual reconciliation, such that at the conclusion of each year of the initial term, a full and complete reconciliation for such year shall be achieved as provided in this subsection. Final reconciliation shall occur at the end of the three (3) year term.

Appellant's Appendix at 155. CAPT asserts that the foregoing language in Section 6.3(b)(3) demonstrates that "the parties intended that each contract year stand on its own, such that the reconciliation at the end of each year was the final reconciliation for that year, with any shortfall *not* carrying over from year to year." Appellant's Brief at 17. CAPT argues that the trial court's decision completely disregards and renders meaningless the explicit agreement that the reconciliation for the fourth quarter of each year shall serve as the annual reconciliation. It argues that "[i]f shortfalls are intended to carry over from year to year, it makes no sense to say that an annual reconciliation is 'full and complete.'" *Id.* at 19. CAPT asserts that the trial court was mistaken in believing that, if there is no carry over in reconciliations from year to year, there would be no reason to provide for a "final reconciliation" and overlooked the fact that there is almost always a time lag between the date anesthesia services are rendered and the date payment is finally received from an insurance carrier, Medicare, Medicaid, or an individual patient. *Id.* It asserts that "[t]he purpose of the reference to a 'final reconciliation' at the end of the three year term was to clearly confirm that there was no expectation that there could be yet another reconciliation for the money which would continue to come in from accounts receivable after the end of the three year term." *Id.* at 19-20.

[19]     SMMC argues that the Agreement unambiguously provides for four types of reconciliations: monthly, quarterly, annual, and a final reconciliation. SMMC argues that CAPT's position "that 'final' essentially means 'for the last year' must be rejected outright, as it would render the term 'final' meaningless." Appellee's Brief at 14. In other words, SMMC contends that the "final reconciliation" would be the same as the last annual reconciliation under CAPT's interpretation. *Id.* SMMC asserts that CAPT's actual cash collections exceed the amounts it repaid by at least $563,000 and that if CAPT is not required to repay the amount of the overage, CAPT's payment for anesthesiology services will be $563,000 more than its actual collections because it was prepaid that money and did not have to pay it back. SMMC argues that the parties' conduct is consistent with the trial court's and SMMC's interpretation of "final reconciliation." *Id.* at 16. SMMC asserts that CAPT asks this court to interpret the contract to read out the term "final reconciliation" so that CAPT does not have to repay amounts that accrued in shortages in year one based on surpluses in years two or three. *Id.* at 19.

[20]     Paragraph 6.3 of the Agreement is titled "Compensation" and provides:

> (a) <u>Compensation for Anesthesiology Services</u>. [CAPT's] actual cash collections for the Anesthesiology Services provided by [CAPT] and the Physicians hereunder net of any refunds ("Collections"), shall (subject to the guarantee and reconciliation provisions in Section 6.3(b) below), constitute the full and complete payment for all Anesthesiology Services.

> (b) <u>Guarantee and Reconciliation</u>.

(1) It is the intention of the parties that [CAPT] generate sufficient revenues from the Anesthesiology Services so as not to require any income subsidization by [SMMC]; however, due to many factors beyond the control of both [SMMC] and [CAPT] (such as the level of coverage required pursuant to this Agreement, the level of uninsured and underinsured patients presenting at [SMMC] whom both [SMMC] and [CAPT] must treat pursuant to this Agreement, and the necessity of complying with controlling provisions of federal law and regulations requiring that certain medical and hospital treatment be provided without regard to a patient's ability to pay, among others), the parties understand that the Anesthesiology Services provided by [CAPT] pursuant to this Agreement may not from time to time generate sufficient revenue to cover the provision of such Anesthesiology Services as mandated by this Agreement.

(2) Consequently, on the Commencement Date and on the first day of each month during the first three (3) years following the Commencement Date, [SMMC] shall pay [CAPT] the sum of $175,000.00 (the "Monthly Income Guarantee Amount") as payment for the Anesthesiology Services provided hereunder (subject to adjustment as provided in the remainder of this Section 6.3(b)). On or before the fifteenth (15th) day of each month during the first three (3) years following the Commencement Date, [CAPT] shall remit to [SMMC] all of its Net Anesthesiology Collections (defined below) received in the immediately prior month, up to (but not exceeding) the Monthly Income Guarantee Amount. For purposes of this Section 6.3(b), Net Anesthesiology Collections shall mean Collections less any amounts due or paid by [CAPT] to its billing company, up to a maximum of ten percent (10%) of Collections, but shall not include (i) any Monthly Income Guarantee or any other payments due or paid by [SMMC] to [CAPT], or (ii) any

collections due or received by [CAPT] for the professional component of pain management services rendered by Physicians. Any shortfall between [CAPT's] Net Anesthesiology Collections and the Monthly Income Guarantee Amount paid by [SMMC] shall be repaid to [SMMC] by [CAPT] (if at all) in accordance with subsections (3), below.

(3) The annual income guarantee for such initial term shall be $2,100,000, payable by [SMMC] to [CAPT] as provided in this Section 6.3(b). Within forty-five (45) days following the end of each contract quarter during each of the three (3) years of the initial term of this Agreement, the parties shall complete an accounting reconciliation of [CAPT's] Net Anesthesiology Collections and compare such Net Anesthesiology Collections for the most recently ended contract quarter to the quarterly guaranteed net collections amount of $525,000 (the "Quarterly Income Guarantee Amount"). If [CAPT's] Net Anesthesiology Collections exceed the Quarterly Income Guarantee Amount, and if [SMMC] has accrued any shortfall amounts (as described in subsections (2), above), then [CAPT] shall pay [SMMC] within fifteen (15) calendar days of the completion of such reconciliation the aggregate of all such shortfall amounts, up to the amount by which [CAPT's] actual Net Anesthesiology Collections exceeds the Quarterly Income Guarantee Amount for such contract quarter. The accounting reconciliation for the fourth (4th) quarter of each of the three (3) years of the initial term of this Agreement shall serve as the annual reconciliation, such that at the conclusion of each year of the initial term, a full and complete reconciliation for such year shall be achieved as provided in this subsection. Final reconciliation shall occur at the end of the three (3) year term.

(c) <u>Audit of Books and Records</u>. Upon reasonable notice, [SMMC] shall have the right to inspect, audit, and make extracts or copies from [CAPT's] books and records during normal business hours in order to verify the relevant Collections and Net Anesthesiology Collections as described herein. [CAPT] shall maintain such books and records for the period of five (5) years from the termination of this Agreement.

Appellant's Appendix at 154-155.

Section 6.3(b)(3) mentioned both an "annual reconciliation" and a "[f]inal reconciliation." *Id.* at 155. The trial court construed the Agreement to avoid a redundancy. Specifically, the trial court found:

> [T]he Court hereby finds that this provision provided for four types of reconciliation-monthly, quarterly, annual and final. To accept CAPT's position that the "final reconciliation" is the last annual reconciliation would render "final" redundant in light of the annual reconciliations and would also render some provisions of the Section meaningless. CAPT's interpretation is inconsistent with the Agreement, which provided that "a full and complete reconciliation" shall be achieved for each year at the annual reconciliation. If, as CAPT contends, there is no carry over in reconciliations from year to year, there would also be no reason to provide for a final reconciliation, as the annual reconciliation provision cited herein ensures that each year is reconciled.

*Id.* at 20. As noted, courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict, and we make all attempts to construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. To the extent that CAPT argues that the court's interpretation rendered meaningless the "full and complete" language

describing the annual reconciliation, we observe that the statement addressing annual reconciliations states:

> The accounting reconciliation for the fourth (4th) quarter of each of the three (3) years of the initial term of this Agreement shall serve as the annual reconciliation, such that at the conclusion of each year of the initial term, a full and complete reconciliation *for such year* shall be achieved as provided in this subsection.

*Id.* at 155 (emphasis added). The language "full and complete reconciliation" describes the reconciliation for each individual year and does not include prior years. This interpretation is favored because it does not render the last sentence of Section 6.3(b)(3) mentioning a "[f]inal reconciliation" superfluous. A final reconciliation which is not duplicative of the annual reconciliations addresses possible shortfalls not already addressed during the three-year term of the Agreement. This interpretation is consistent with Section 6.3(b)(2), which states in part: "*Any shortfall* between [CAPT's] Net Anesthesiology Collections and the Monthly Income Guarantee Amount paid by [SMMC] shall be repaid to [SMMC] by [CAPT] (if at all) in accordance with subsections (3), below." *Id.* (emphasis added). The trial court did not err in entering summary judgment in favor of SMMC on this issue.

B. *Locum Tenens Physicians*

CAPT argues that, "[b]ecause there is no dispute about the fact that Doctor G was a problematic physician, and no dispute about the accuracy of [the accounting of *locum tenens* expenses], CAPT should have been granted summary judgment on this issue." Appellant's Brief at 21. CAPT argues that

Dr. G was the cause of staffing, quality, and risk management problems before CAPT ever became involved with SMMC, and that the difficulties Dr. G caused were the very reason SMMC was looking for a new anesthesia service provider in 2006. CAPT asserts that Dr. G.'s last day at the hospital was to be June 13, 2008, and the date of his removal came well after the date of his letter of resignation, which was April 14, 2008, and that the only requirement for it to have a right of reimbursement for *locum tenens* expenses is a request by SMMC for the removal of a physician pursuant to Section 8.4. CAPT seeks reimbursements of the *locum tenens* expenses it incurred as a result of the removal of Dr. G.

[23] SMMC argues that CAPT had to replace Dr. G regardless of SMMC's belated request to remove him because Dr. G had already tendered his letter of resignation. SMMC contends that Section 3.12 provides SMMC is responsible for fifty percent of the cost of *locum tenens* physicians "if they occurred 'upon the [SMMC's] request to remove per Section 8.4' *and* 'if a mutually agreeable and reasonable amount of time is not provided' to replace such a physician." Appellee's Brief at 21. SMMC argues that CAPT fails to meet either condition and that the portions of the record cited by CAPT show only that the costs were for one *locum* physician, not that they were for Dr. G. SMMC contends that "providing *locum* coverage for just Dr. G could not have been a cause of additional expenses that SMMC was supposed to bear under the contract, as even with such *locum* coverage, SMMC [sic] was still short-staffed." *Id.* at 22. SMMC argues that CAPT advised SMMC as to Dr. G's resignation on March

25, 2008, and CAPT assured SMMC that it had already been in contact with several well-qualified anesthesiologists regarding the position and that it would continue to provide satisfactory anesthesia services to SMMC. Without citation to the record, SMMC argues that "[a]t no point did CAPT advise SMMC that its request for removal was not reasonable or that it did not agree with the timeframe or removal for replacement." *Id.* SMMC contends that "CAPT's failure to complain about the request to remove Dr. G (after he had already resigned) should be construed as an implicit consent or waiver of any ability to contest the timeliness of the replacement of Dr. G." *Id.* at 23. SMMC also contends that CAPT breached the agreement first because it failed to adequately staff SMMC and did not provide SMMC with four physicians during the majority of the term of the Agreement. In its reply brief, CAPT asserts that it always had four physicians available for the practice, and any claim that a failure by CAPT to provide adequate staffing was released by the Termination Agreement.

[24]     Section 3.12 of the Agreement is titled "Locum Tenens Physicians" and provides:

> For the first three (3) months of this Agreement, or at any time upon [SMMC's] request to remove a Physician per Section 8.4 if a mutually agreeable and reasonable amount of time is not provided to replace such Physician, it may be necessary for [CAPT] to retain one or more locum tenens physicians specializing in the practice of Anestbesiology [sic] (the "Locum Tenens Physician") to provide Anesthesiology Services. In such a case, [SMMC] shall reimburse [CAPT] for fifty percent (50%) of all direct and indirect costs of each and every Locum Tenens Physician incurred by [CAPT], upon receipt of a written

invoice for those costs.

Appellant's Appendix at 149.

[25] Paragraph 8.4 of the Agreement is titled "Termination of an Individual Physician" and provides:

> In the event that any Physician commits a material breach of the terms of this Agreement, [SMMC] shall provide notice to [CAPT], who shall have the right to investigate and remedy any deficiencies within thirty (30) days. [CAPT] agrees to remove a problematic physician upon the request of the Hospital Administrator. [CAPT] also shall have the right to remove a Physician and substitute additional Physician's [sic] as required to meet [SMMC's] need. Termination of such Physician shall constitute a cure of the alleged breach for the purposes of Section 8.3(b) above.

*Id.* at 158.

[26] The designated evidence reveals that SMMC requested that CAPT remove Dr. G. on May 18, 2007, but later withdrew the request on July 19, 2007. In an email dated March 25, 2008, Dr. Ramani informed Ryba, an administrator of SMMC, that Dr. G resigned his position as an anesthesiologist at SMMC and that Dr. G informed CAPT that his last date of service would be June 13, 2008. In a letter dated April 14, 2008, Dr. G wrote Dr. Devanathan, the chairperson of the Medical Executive Committee at SMMC, and the Executive Committee, stating: "Effective April 1, 2008, I am tendering my resignation as Chairman of the Department of Anesthesia at [SMMC] for personal reasons." *Id.* at 241. In a letter dated April 18, 2008, SMMC requested Dr. G's removal and

acknowledged that a "reasonable period of time may be necessary for an appropriate transition of services as mutually agreed by the parties." *Id.* at 242.

Given that by the time SMMC sent its April 18, 2008 letter Dr. G had already informed CAPT that he resigned his position as anesthesiologist at SMMC and that his last day of service would be June 13, 2008; that SMMC did not request that Dr. G be removed earlier than June 13, 2008; and that SMMC acknowledged a reasonable period of time may be necessary for an appropriate transition, we conclude that the designated evidence does not demonstrate a question of fact as to whether costs were incurred as the result of SMMC's request for removal of Dr. G. Accordingly, we affirm the trial court's grant of SMMC's motion for summary judgment with respect to Count II of CAPT's counterclaim.

C. *Non-solicitation*

CAPT observes that the Termination Agreement conditioned SMMC's release from the non-solicitation provision of the Agreement on both full compliance with its final reconciliation obligations and also payment of all *locum tenens* expenses. CAPT argues that if the trial court erred in its resolution of either the reconciliation or *locum tenens* issue, then it is entitled to summary judgment on its claim for liquidated damages under the non-solicitation provision of the agreement. Because we conclude that the trial court did not err in entering summary judgment in favor of SMMC on the reconciliation issue and *locum tenens* issue, we conclude that the provision in the Termination Agreement in

which CAPT agreed to release Dr. Seshadri in exchange for SMMC paying CAPT $100,000 is enforceable.[5]  Thus, we cannot say that the trial court erred in granting summary judgment to SMMC on this issue.

### *Conclusion*

[29]  For the foregoing reasons, we affirm the trial court's order.

[30]  Affirmed.

Barnes, J., and Bradford, J., concur.

---

[5] We note that the trial court's order found that "[p]ursuant to the Termination Agreement, [SMMC] paid CAPT $100,000 to release CAPT's remaining employed anesthesiologist from the non-solicitation clause contained in the initial Agreement."  Appellant's Appendix at 18.  CAPT concedes in its brief that SMMC has already paid $100,000 following the execution of the Termination Agreement for the solicitation, hiring, or retention of Dr. Seshadri.